UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

**LUCINDA ALLEN,**

                    Plaintiff,

          v.                                                    5:02-CV-1265 (NAM/DEP)

**ADVANCED DIGITAL INFORMATION
CORPORATION**

                    Defendants.
_____

**APPEARANCES:**                                    **OF COUNSEL:**

BERNBACH LAW FIRM, PLLC                  JEFFREY M. BERNBACH, ESQ.
Renaissance Corporate Center
245 Main Street 5th Floor
White Plains, New York 10601
*Attorneys for Plaintiff*

BOND, SCHOENECK & KING, PLLC          THOMAS J. GROOMS, ESQ.
One Lincoln Center
Syracuse, New York 13202
*Attorneys for Defendant*

**Norman A. Mordue, Chief U.S. District Judge**

**MEMORANDUM - DECISION AND ORDER**

          Plaintiff, Lucinda Allen ("Allen"), filed this action against her former employer, defendant,

Advanced Digital Information Corporation ("ADIC"), asserting claims under Title VII of the of the

Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., ("Title VII"), the Equal Pay Act,

29 U.S.C. § 206(d)(1) ("EPA"), and the New York State Human Rights Law ("NYHRL"). *See* Dkt.

No. 1, Compl.  In her complaint, Allen contends that ADIC: (1) subjected her to a sex-based hostile

work environment, *see id.* at ¶ 53; (2) denied her equal pay for equal work, *see id.* at ¶ 57; (3)

subjected her to other acts of gender-based discrimination; and (4) terminated her in retaliation for

having complained of gender discrimination and a sexually hostile work environment.  *See* Dkt. No. 1, Compl. at ¶¶ 41, 55.  ADIC moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure arguing that: (1) Allen cannot establish a hostile work environment claim under Title VII or the NYHRL because the alleged inappropriate comments and mistreatment of her, even if true, are not severe, pervasive or gender-based as necessary to state a claim under the law; (2) Allen cannot establish a claim based on unequal pay under the EPA because the males to whom she compares herself were employed in different establishments and/or performed different work in different jobs requiring greater skill and/or responsibility, so that any pay disparity is not actionable under the law[1]; (3) Allen cannot establish a gender discrimination claim under Title VII or the NYHRL under any theory because (a) the record contains no evidence to suggest that the alleged mistreatment of her by ADIC occurred because of her sex, (b) the alleged mistreatment (other than her termination) fails to rise to the level of an adverse employment action, and (c) her inclusion in the reduction-in-force resulted from legitimate business reasons having nothing to do with her sex; and, (4) Allen cannot establish a claim for retaliation under Title VII or the NYHRL because (a) she did not engage in protected activity, (b) ADIC terminated her employment for legitimate business reasons, and (c) Allen has insufficient evidence to establish a causal link between her termination and any protected activity.  *See* Dkt. No. 18, Mem. of Law at 2-3.  For the reasons that follow below, ADIC's motion for summary judgment is GRANTED IN PART and DENIED IN PART.

## I.    BACKGROUND

### A.    *Pathlight Hires Allen*

Allen began working for Pathlight Technology ("Pathlight"), a corporation located in Ithaca,

---

[1] At oral argument Allen's counsel indicated that Allen was no longer pursuing EPA claims against ADIC.

New York, and a predecessor of ADIC, on May 16, 2000. Dkt. No. 18, Statement of Material Facts at ¶¶ 1, 3. Pathlight operated as a technology company that developed products for data management, storage and networking: the business involved advanced areas of science and engineering. Dkt. No. 18, Statement of Material Facts at ¶ 6. Pathlight hired Allen as a project manager based upon her prior managerial experience at New York State Electric & Gas Company. *Id.* at ¶¶ 2, 7. Pathlight's Executive Vice President Said Rahmani Kherzri ("Rahmani") made the decision to hire Allen and was her supervisor. *Id.* at ¶ 2. At the time of her hiring, Allen's highest academic degree was a two-year Associate's Degree in Data Processing conferred upon her by Tompkins Cortland Community College. *Id.* at ¶ 7. Allen's starting annual salary was $75,000. *Id.* at ¶ 4. For the duration of her employment with Pathlight, and later with ADIC, Allen worked out of the company's facility in Ithaca. *Id.* at ¶ 5. Allen's employment duties included coordinating product development activities among various technical engineering teams and technical managers. *Id.* at ¶ 7.

    B.    *Allen's Performance with Pathlight and ADIC*

During her tenure with Pathlight, Allen received consistently positive formal and informal performance evaluations from Rahmani, *see* Dkt. No. 20, Counter Statement of Material facts at ¶¶ 4-9, and in or about September 2000, Allen received a recommendation of promotion from Rahmani, *see* Dkt. No. 18, Statement of Material Facts at ¶ 8. In or about January 2001, ADIC revealed its merger with or acquisition of Pathlight. The merger became effective on May 11, 2001. At all relevant times, ADIC was based in Redmond, Washington with satellite offices throughout the United States and abroad. *Id.* at ¶¶ 9-10. During the merger, Rahmani again recommended Allen for a

promotion.[2]  On March 15, 2001, ADIC promoted Allen to the position of Executive Director of

Product Development at the Ithaca facility.  *See* Dkt. No. 20, Counter Statement of Material Facts

at ¶ 25.  The promotion was made retroactive to February 5, 2001, and ADIC increased Allen's salary

to $90,000 annually.  Dkt. No. 18, Statement of Material Facts at ¶ 12.

With the merger of Pathlight into ADIC, Rahmani became ADIC's Executive Vice President

of Research and Development worldwide, and he transferred to ADIC's headquarters in Redmond.

Rahmani's relocation limited his presence at the Ithaca facility to only a few days each month;

consequently, most of the communications between Rahmani and Allen were by e-mail or telephone.

*Id.* at ¶ 13.  After the merger, ADIC became a matrix organization with different people responsible

for different functions across the company and others with responsibilities limited to their specific

facilities.  Allen was responsible for projects and products being developed in Ithaca, and was the

primary leader of the Ithaca facility.  *Id.* at ¶ 14.

Allen continued to perform well as an ADIC employee, as evidenced by ADIC's response to

Allen's EEOC Charge of Discrimination, in which it noted that "[t]here is no documented indication

of a performance issue" and that "all documentation reflects 'Good' or better performance." Dkt. No.

20, Counter Statement of Material Facts at ¶ 38.  On or about June 1, 2001, Allen received a $5,000

raise increasing her annual salary to $95,000.  The increase was greater, in terms of percentage, than

---

[2]Although the significance is not readily apparent to the Court, the parties disagree as to which position Rahmani recommended Allen.  ADIC contends that Rahmani recommended that it promote Allen to Executive Director of Product Development, *see* Dkt. No. 18, Statement of Material Facts at ¶ 10, while Allen contends that Rahmani had recommended that ADIC promote Allen to Director of Product Development, a position inferior to that of Executive Director.  *See* Dkt. No. 20, Counter Statement of Material Facts at ¶¶ 17-18.  Allen contends that ADIC's President, Chuck Stonecipher ("Stonecipher"), upgraded Allen's recommended promotion to Executive Director.  *Id.* at ¶ 22.  For his part, Stonecipher avers that Rahmani recommended Allen for the position of Executive Director of Product Development, and that despite his initial reluctance to appoint her to such a position, he acquiesced based upon Rahmani's assurances that he would assist Allen in making the transition. Dkt. No. 18, Stonecipher Aff. at ¶¶ 3-4. In any event, the parties agree that Allen received a promotion.

4

most salary increases ADIC awarded at the time. Dkt. No. 18, Statement of Material Facts at ¶ 16. By July 2001, however, Stonecipher expressed concern regarding the performance of the Ithaca facility and expressed his dissatisfaction with some of Allen's statements and her level of contribution in company meetings. Stonecipher directed Rahmani to discuss the Ithaca facility's problems with Allen. *Id.* at ¶¶ 18-19.

> ### C. Allen and Rahmani's Meeting of July 31, 2001, Aftermath and Other Alleged Discrimination

On July 31, 2001, Allen and Rahmani met in Ithaca. Allen recalls that she began the meeting by voicing her concerns regarding Rahmani's alleged practice of bypassing her and raising work-related issues directly with her subordinates. Dkt. No. 20, Counter Statement of Material Facts at ¶ 39. According to Allen, Rahmani did not take kindly to her expressed concerns and became confrontational. *Id.* Although the parties disagree as to what was said as the meeting continued, it is clear that Allen became emotionally upset and later accused Rahmani of allegedly making the following remarks: (1) Allen was not "strong enough to do the job"; (2) Allen could not "take the pressure of the job"; (3) "This isn't some soap opera here where you can run back to the kitchen crying"; (4) "We aren't married and you can't just go off crying because you don't like what I say"; and (5) "You're too sensitive." *Id.* at ¶¶ 20-21.

On August 1, 2001, Rahmani telephoned Allen. During the call, Allen advised Rahmani that she felt his remarks of the previous day were sexually discriminatory, and vowed that if he persisted in making such comments, then she would file a charge of discrimination. Dkt. No. 20, Counter Statement of Material Facts at ¶ 62. Allen claims that Rahmani then unleashed a torrent of threatening and retaliatory remarks. Allen alleges that Rahmani accused her of "stooping to the lowest level" and "playing games" and threatened to "make [her] life miserable" and "do everything

5

in [his] power to destroy [her]."  Dkt. No. 20, Counter Statement of Material Facts at ¶ 64.  Early the next morning, Rahmani provided Shannon Van Oppen ("Van Oppen"), ADIC's Executive Director of Human Resources, with an update on Allen in which he criticized her disciplinary/motivational approach and concluded that her attitude was unhealthy.  *See* Dkt. No. 20, Bernbach Aff. at Ex. 22.

On August 2, 2001, Allen and Rahmani met with Lisa Thompson ("Thompson"), the Ithaca facility's Human Resources Manager to discuss Allen's accusations.  Thompson ended the meeting after approximately five minutes because Allen and Rahmani were unable to make any progress toward a resolution of their apparent dispute.  Thompson then referred the matter to Van Oppen, ADIC's Executive Director of Human Resources, for investigation.  Dkt. No. 18, Statement of Material Facts at ¶ 22.  On August 2, 2001, Rahmani sent an e-mail to Stonecipher, which apprised him that Allen had accused him of sex discrimination,  and that she was "indeed very serious."  Dkt. No. 20, Bernbach Aff. at Ex. 27.  On August 3, Allen had a telephone conversation with Van Oppen regarding the allegations made by Rahmani.  Van Oppen assured Allen that she would investigate Allen's allegations in accordance with ADIC's Anti-Harassment/Non-Discrimination Policy.  Van Oppen also advised Allen that she should be present for all future meetings between Allen and Rahmani.  *Id.* at ¶ 23.  After July 31, 2001, Allen discussed her allegations a number of times with representatives from ADIC's corporate Human Resources Department.  After its investigation of Allen's charges, ADIC concluded that Rahmani was a difficult manager but that there was no basis for Allen's charge of discrimination.  *Id.* at ¶ 24.

Allen alleges that her professional relationship with Rahmani did not improve after the meeting with Thompson and Van Oppen's intervention.  Allen contends that after her confrontation with Rahmani, he "severed virtually all communication with her."  *See* Dkt. No. 20, Pl.'s Mem. of

law at 5-6.  Allen claims that Rahmani's retaliatory failure to communicate with her left her isolated and compromised her ability to perform her job effectively.  *See* Dkt. No. 20, Pl.'s Mem. of law at 5-6.  Moreover, Allen claims that in the wake of the July 31st meeting, Rahmani deprived her of critical information, which caused her great embarrassment and humiliation at meetings with her superiors and subordinates alike.  Dkt. No. 20, Counter Statement of Material Facts at ¶¶ 104-06.

Allen's claims of Rahmani's sexism are not limited to the July 31st meeting.  She also directs the Court's attention to meetings of the Ithaca management team prior to July 31, 2001, where "Rahmani invariably assigned [her], the only woman on the team, and never any of the male team members, the stereotypical[] female task of note-taking which demeaned plaintiff . . . ."  Dkt. No. 20, Counter Statement of Material Facts at ¶ 47.  Allen claims that she objected to her assigned secretarial duties, and that by dismissing her complaints, Rahmani only further demeaned her.  *Id.* at ¶ 48.

## D.    *ADIC Restructures/Allen's Termination*

Spurred by the September 11th terrorist attacks and revenues that had failed to meet projections, in late September 2001, ADIC resolved to undertake a companywide restructuring.  *Id.* at ¶ 124.  In October 2001, ADIC implemented its restructuring initiative and downsized, which culminated in the termination of forty[3] employees on October 15, 2001.  Of the terminated employees, nine, including Allen and Executive Director William Seward, were from ADIC's Research and Development organization.  With the exception of Allen, all of the terminated Research and Development employees were men.  *See* Dkt. No. 18, Ex. 27.  In addition, James Geronaitis, from the Sales and Marketing Department, was also among the forty employees terminated.  Dkt. No. 18,

---

[3]As explained below, the parties dispute whether Allen was among the forty employees terminated on October 15, 2001.

Statement of Material Facts at ¶ 32.  ADIC terminated three employees, including Allen, from the Ithaca facility.  *See* Dkt. No. 18, Ex. 27.

ADIC terminated Allen in October 2001.  ADIC asserts that Allen's termination was part of the restructuring efforts and forty person layoff it implemented effective October 15, 2001.  ADIC asserts that the restructuring transformed the Ithaca facility such that its exclusive focus became product development and engineering.  Stonecipher decided to include Allen in the reduction-in-force based upon his belief that she lacked the requisite technical expertise and had not demonstrated the ability to coordinate the various elements of the facility.  *See* Dkt. No. 18, Statement of Material Facts at 33; Stonecipher Aff. at ¶¶ 8-9.  Indeed, the record confirms that ADIC included Allen on the original layoff list of forty names it assembled on or about September 25, 2001.  Dkt. No. 18, Van Oppen Dep. at 124-25; Stonecipher Aff. at ¶¶ 8-9; Rahmani Dep. at 183-84; Ex. 27. Allen, however, suggests that ADIC's assertions amount to a subterfuge constructed after the fact.  Allen maintains that she was not among the forty employees terminated by ADIC on October 15, 2001.  *See* Dkt. No. 20, Counter-Statement of Material Facts at ¶ 142.

Despite ADIC's placement of Allen on the layoff list at Stonecipher's behest, previously, ADIC was considering two options by which it would keep Allen as an employee: (1) transferring her to another position at ADIC's Redmond facility; or (2) granting her an extended leave of absence to allow her to complete her education.  Dkt. No. 21, Reply Mem. of Law at 5; Dkt. No. 18, Pl.'s Ex. 21; Dkt. No. 18, Statement of Material Facts at ¶ 33.  It is undisputed that Allen and Van Oppen discussed these options.  *See* Dkt. No. 21, Reply Mem. of Law at 6; Dkt. No. 20, Counter Statement of Material Facts at ¶ 95.

On October 4, 2001, a tearful Allen advised Van Oppen that she no longer could continue

working under the existing circumstances, *i.e.*, Rahmani's alleged mistreatment of her, and needed to consult with a physician regarding her health. *Id.* at ¶ 136. Allen began a medical leave of absence that day. Dkt. No. 21, Reply Mem. of Law at 6; Dkt. No. 20, Mem. of Law at 8. In the meantime, the parties apparently continued to exchange leave proposals. *See* Dkt. No. 20, Counter Statement of Material Facts at ¶¶147-48. On October 15, 2001, during her medical leave, Allen sent an e-mail to Van Oppen in which she acknowledged her receipt of a draft leave of absence agreement and indicated that she would be reviewing it with her attorney. *See* Dkt. No. 21, "P-28." On October 16, 2001, Van Oppen traveled to Ithaca to meet with Allen to discuss the leave of absence agreement. Van Oppen contacted Allen by telephone apparently to either confirm or make arrangements for a dinner meeting. Allen, however, indicated they would not be having dinner together. Much like the other previously proposed leave of absence agreements she rejected, Allen rejected that leave of absence agreement as well. She was concerned that there was neither a firm offer of employment on the table nor a guarantee that a position awaited her upon her return from leave.[4] *See* Dkt. No. 18, ADIC Response to EEOC Charge at ¶ 30; Dkt. No. 20, Bernbach Aff. at Ex. 1, Allen Tr. at 146; Counter Statement of Material Facts at ¶ 148. Moreover, at this time Allen also advised Van Oppen that despite her previously expressed commitment not to pursue charges, she planned to sue ADIC for sex discrimination. *See* Dkt. No. 18, ADIC Response to EEOC Charge at ¶ 30; Dkt. No. 20, Counter Statement of Material Facts at ¶ 154.

ADIC asserts that Allen's rejection of the most recent leave proposal caused it to reconsider its projected relationship with Allen and resulted in ADIC terminating Allen's employment. ADIC

---

[4]Allen had previously declined invitations to consider relocating to ADIC facilities in Redmond and Denver, Colorado because she wished to remain in Ithaca, due, at least in part, to her relationship with her significant other. Dkt. No. 20, Bernbach Aff. at Ex. 1, Allen Tr. at 145-46.

contends that prior to October 16, 2001, there was nothing to suggest that Allen would not continue with ADIC as an employee or on a leave of absence basis with the possibility of returning to ADIC in a different position, but that after Allen's rejection of the most recent leave of absence agreement, it had no choice but to terminate her employment.  *See* Dkt. No. 21, Reply Mem. of Law at 6-7.

Allen contends that it was her expressed intent to litigate her claims of sex discrimination that was the impetus for her termination.  On October 17, 2001, ADIC terminated Allen's access to her company computer and voice-mail.  Dkt. No. 20, Counter Statement of Material Facts at ¶ 155.  On October 25, 2001, Allen's attorney at the time sent a letter to ADIC, which reiterated Allen's intention to pursue claims of gender discrimination.  *Id.* at ¶ 157; Bernbach Aff., Ex. 42.  On October 30, 2001, ADIC notified Allen that it had included her in the layoffs of October 15, 2001.  *Id.* at ¶ 158.  Allen directs the Court's attention to the deposition testimony of Van Oppen who, when asked what led to the formalization of Allen's termination, answered that she "imagine[d] it was that letter from her lawyer."  *Id.*, Ex. 2, Van Oppen Tr. at 162-63.

## II.   DISCUSSION

### A.   *Summary Judgment Standard*

The standard for summary judgment is familiar and well-settled.  Rule 56 allows for summary judgment where the evidence demonstrates that "there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is properly regarded as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (quoting FED. R. CIV. P. 1).  A court may grant a motion for summary judgment when the moving party carries its burden of showing that no

triable issues of fact exist.  *See Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990).  In light of

this burden, any inferences to be drawn from the facts must be viewed in the light most favorable to

the non-moving party.  *See id.*; *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

If the moving party meets its burden, the burden shifts to the non-moving party to come forward with

"specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e).  To defeat a

motion for summary judgment, however, the non-moving party "must do more than simply show that

there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586 (1986).  A dispute regarding a material fact is genuine "if evidence

is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson*, 477 U.S.

at 248.  When reasonable minds could not differ as to the import of the evidence, then summary

judgment is proper.  *See Anderson*, 477 U.S. at 250-251.

      B.    *Allen's Claims*

          1.     Sex-Based Hostile Work Environment

Allen asserts her hostile work environment claims pursuant to Title VII and the NYHRL.

New York courts require the same standard of proof for claims brought under the NYHRL as those

brought under Title VII, and thus, claims under the NYHRL and under Title VII are essentially

identical.  *See Brown v. County Of Oneida*, 41 F.Supp.2d 172, 180 (N.D.N.Y. 1999) (citing *Tomka*

*v. Seiler*, 66 F.3d 1295, 1304 n.4 (2d Cir. 1995) (citing *Miller Brewing Co. v. State Div. of Human*

*Rights*, 66 N.Y.2d 937, 498 N.Y.S.2d 776, 489 N.E.2d 745 (1985))); *see also Weinstock v. Columbia*

*Univ.*, 224 F.3d 33, 42 n. 1 (2d Cir. 2000) (identical standards apply to employment discrimination

claims brought under both Title VII and N.Y. HRL § 296) (citing cases); *Stetson v. NYNEX Serv. Co.*,

995 F.2d 355, 360 (2d Cir. 1993) (plaintiff's claim under NYHRL "is governed by the same standards

as his federal claim").  Thus, the Court examines Allen's Title VII and NYHRL claims in tandem.

To prevail on a claim of sexual harassment based upon a hostile work environment requires a showing: (1) that the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and (2) that a specific basis exists for imputing that conduct to the employer.  *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (internal citations and quotation marks omitted).  The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule and insult that the terms and conditions of her employment were thereby altered.  *See Leibovitz v. New York City Transit Auth.*, 252 F.3d 179, 188 (2d Cir. 2001) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).  "Conduct that is merely offensive, unprofessional, or childish cannot support a hostile work environment claim."  *Kahn v. Objective Solutions, Intern.*, 86 F.Supp.2d 377, 381 (S.D.N.Y. 2000) (citation omitted).  This test has objective and subjective elements: the misconduct shown must be "severe or pervasive enough to create an objectively hostile or abusive work environment," and the victim must also subjectively perceive that environment to be abusive.  *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002).  To determine whether a work environment is hostile or abusive, requires the Court to examine the totality of the circumstances, which may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993).  As a general rule, "[t]he incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive."  *Perry*, 115 F.3d at 149 (citation and internal quotation marks omitted); *Cruz v. Coach Stores, Inc.*, 202 F.2d 560, 566 (2d Cir. 2000) ("Isolated incidents

of harassment ordinarily do not rise to [a hostile working environment].").

ADIC contends that the Court must dismiss Plaintiff's hostile work environment claims under Title VII and the NYHRL because the record contains no evidence to establish that the alleged objectionable conduct was sufficiently severe or pervasive to alter the conditions of Allen's employment and create an abusive working environment.  Allen limits her allegations of overt sexual harassment to the comments allegedly made by Rahmani on July 31, 2001.  Beyond the July 31st comments, Allen broadly asserts that Rahmani subjected her to an "intensely hostile work environment" by "refusing to communicate with her" and "publicly humiliating her . . . ."  Dkt. No. 20, Mem. of Law at 15-16.  Finding only minimal evidentiary support in the record, Allen's arguments amount to much blustering.

Allen claims that Rahmani demeaned her by assigning her, as the only woman, secretarial duties during meetings of the Ithaca management team.  She also claims that he virtually severed all communication with her post-July 31, 2001.  The Court declines to make the inferential leap from the assignment of secretarial duties to finding a sex based hostile work environment.  If in fact Rahmani assigned secretarial duties based strictly upon sex, then the Court might opine that his decision was based upon an outdated stereotype, but that "outdated," in this instance, does not support a sex based hostile work environment.  Moreover, even assuming *arguendo* that the assignment of secretarial duties supports the inference of a sex based hostile work environment, Allen gives no indication as to how many times Rahmani her charged with performing such duties.

With respect to the alleged "silent treatment" of which Allen complains, ADIC effectively argues that the record does not support her claim that Rahmani severed communications with her.  *See* Dkt. No. 21, Mem. of Law at 8-9.  At her deposition Allen could not identify a single e-mail she

sent to Rahmani to which he did not respond.  *See* Dkt. No. 18, Allen Dep. at 122-23.  As to plaintiff's contention that in September 2001, Rahmani humiliated her by questioning her performance at a meeting in front of six or seven of her subordinates, *see id.* at 131-32, the Court finds that Rahmani's conduct in this regard is grounded in workplace, rather than gender dynamics. While such allegations might support an inference of unprofessional conduct, they do not support a claim for a sex based hostile work environment.  *See Brown v. Henderson*, 257 F.3d 246, 256 (2d Cir. 2001); *Alfano*, 294 F.3d at 377 (acknowledging that while "many bosses are harsh, unjust, and rude[,] [i]t is . . . important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination.").

Assuming *arguendo* that Allen's allegations of overt sexual harassment support a finding that she was subjected to hostility because of her membership in a protected class, Allen points to but a single day.  Although the Second Circuit has held that "even a single episode of harassment . . . can establish a hostile work environment," *Richardson v. New York State Dep't. of Correctional Service*, 180 F.3d 426, 437 (2d Cir. 1999), the single episode need be " 'extraordinarily severe to have altered the conditions of [the plaintiff's] working environment.' "  *Alfano*, 294 F.3d at 374 (quoting *Cruz*, 202 F.3d at 570); *see*, *e.g.*, *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) (finding that vile and sexually explicit verbal abuse of a female firefighter that challenged her competence, was witnessed by a large group that included her subordinates, and created a justified fear that she would be left in peril at fire scenes intolerably altered plaintiff's work environment); *Richardson*, 180 F.3d at 437 (observing that a single sexual assault may be sufficient to alter the terms and conditions of the victim's employment).  As to severity, however, the comments allegedly made by Rahmani to Allen–that she was not "strong enough to do the job," that she could not "take the pressure of the

14

job," that "[t]his isn't some soap opera here where you can run back to the kitchen crying," that "we aren't married and you can't just go off crying because you don't like what I say," and "[y]ou're too sensitive"–while perhaps constituting strong language, are relatively benign when compared against those found to adequately support hostile work environment claims. *Compare Alfano*, 294 F.3d at 378-380 (collecting cases and finding that five incidents, three of which amounted to different iterations of a single sexual prank, over a four-year period, were too few, too separate in time and too mild to sustain a hostile work environment claim) *and Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998) (finding an appreciative comment about plaintiff's buttocks and a deliberate touching of her breasts insufficient as a matter of law to alter the terms and conditions of employment) *with Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d 597, 600-02 (2d Cir. 2006) (finding that a reasonable jury could conclude that plaintiff's conditions of employment were sufficiently altered where the plaintiff's supervisor: told the plaintiff that if she wanted a raise she was "sleeping with the wrong employee" (a reference to her romantic relationship with another co-worker) and repeated similar comments several times during the course of the next five months; placed his hand on the plaintiff's skirt and upper thigh and photographed himself doing so at an office Christmas party in the presence of other employees; asked if they could go together to the plaintiff's hotel room after the party; and, on several occasions, approached the plaintiff from behind while she was working, leaned into her, and placed his hands on her back, neck, and shoulders); *Fairbrother v. Morrison*, 412 F.3d 39, 50 (2d Cir. 2005) (holding that a jury could reasonably find severe or pervasive workplace hostility where for a period of several months, the plaintiff was called "bitch" almost daily, and called "whore" ten to fifteen times; the plaintiff's male colleagues routinely talked about their sexual activities and asked the plaintiff about hers and why she was not wearing a French

maid outfit); *Raniola v. Bratton*, 243 F.3d 610, 621 (2d Cir. 2001) (finding a triable issue where the plaintiff demonstrated that in two and a half years, she was subjected to offensive sex-based remarks, disproportionately burdensome work assignments, workplace sabotage and one serious threat of physical harm); *Schwapp v. Town of Avon*, 118 F.3d 106 (2d Cir. 1997) (holding that the plaintiff had created a triable issue based on ten to twelve instances of explicitly racist conduct in twenty months, where most of the incidents involved racial jokes and epithets that insulted blacks, Puerto Ricans, and people of Middle Eastern origin); *and Holtz*, 258 F.3d at 75-76 (finding a triable issue where during more than one year of employment, plaintiff's harasser touched plaintiff's hand on a "daily basis," made "obscene leers at her," "tried to peer down her blouse and up her skirt," and made "approximately ten or twenty" insinuating remarks about her sex life). Here, there was no physical threat attached to the allegedly inappropriate comments. In short, Allen's allegations do not meet the *Alfano* threshold for frequency and severity because the comments she has catalogued are "too few . . . and too mild . . . to create an abusive working environment." *Alfano*, 294 F.3d at 380. Allen's hostile work environment claim fails.

### 2.    Sex Discrimination/Disparate Treatment

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). The Court analyzes claims of discrimination under Title VII with the three-step burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1972). The plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *Williams v. R.H. Donnelley Corp.*, 368 F.3d 123, 126 (2d Cir. 2004). The establishment of a *prima facie* case creates a rebuttable presumption of discriminatory animus

that shifts the burden of production to the defendant to proffer a legitimate, nondiscriminatory reason for its adverse employment action. *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (citing *McDonnell Douglas*, 411 U.S. at 802). If the defendant articulates such a rationale, "the presumption of discrimination drops out," *Roge v. NYP Holdings, Inc.*, 257 F.3d 164 (2d Cir. 2001), and the plaintiff must be afforded "an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U .S. at 253. "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." *Weinstock*, 224 F.3d at 42. The Second Circuit has cautioned, however, that "[i]t is not enough . . . to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination." *Id.*

a. *Prima Facie* Case

To establish a claim of discrimination under Title VII, a claimant must show that: "(1) [s]he belonged to a protected class; (2) [s]he was qualified for the position; (3) [s]he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (citing *Collins v. New York City Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002). An " 'adverse employment action' is one which is 'more disruptive than a mere inconvenience or an alteration of job responsibilities.' " *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (quoting *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993)). "An adverse employment action may or may not entail economic loss, but there must be a link between the discrimination and some 'tangible job benefits' such as 'compensation, terms, conditions or

17

privileges' of employment." *Alfano*, 294 F.3d 365, 373 (2d Cir. 2002) (quoting *Karibian v. Columbia Univ.*, 14 F.3d 773, 778 (2d Cir. 1994)).   Examples of materially adverse changes include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Galabya*, 202 F.3d at 640 (quoting *Crady v. Liberty Nat'l Bank and Trust Co. of Indiana.*, 993 F.2d 132, 136 (7th Cir. 1993)).   To prevail on a discrimination claim, a Title VII "plaintiff is required to prove that the defendant had a discriminatory intent or motive."   *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986 (1988); *see Schwabenbauer v. Bd. of Ed. of City Sch. Dist. of City of Olean*, 667 F.2d 305, 309 (2d Cir. 1981) (explaining that under Title VII, to establish a claim of disparate treatment claim based upon sex "a female plaintiff may show that she was treated less favorably than men in circumstances from which a gender-based motive could be inferred . . . .").   A disparate treatment requires a showing of an adverse employment action "either because of gender or because a sexual advance was made by a supervisor and rejected." *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 62 (2d Cir. 1992).

Here, Allen, as a female who was discharged, satisfies the first and third *prima facie* elements. As to the second element, Allen has raised a question of fact sufficient to withstand summary judgment.   To meet the threshold for the second element, a plaintiff need only show that she "possesses the basic skills necessary for performance of [the] job." *De La Cruz v. New York City Human Resources Admin. Dep't of Social Serv.*, 82 F.3d 16, 20 (2d Cir. 1996) (citing *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1155 (2d Cir. 1978)).   A reasonable factfinder could infer that based upon Allen's favorable performance reviews, as well as her promotion and pay raise–which occurred

approximately seven and four months, respectively, prior to her termination–that she must have been qualified for the position. *See  Morris v. New York City Dept. of Sanitation*, 2003 WL 1739009, at *5 (S.D.N.Y. Apr. 2, 2003) (finding plaintiff was qualified where he had received good to excellent performance evaluations and received commendations for his performance).

With respect to the fourth *prima facie* element, the parties dispute whether the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent, for while Allen contends that the record is replete with evidence of discriminatory intent, *see* Dkt. No. 20, Mem. of Law at 13, ADIC argues that the record contains no evidence of any adverse employment action due to Allen's gender. *See* Dkt. No. 18, Mem. of Law at 20.  In the Second Circuit, "a plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse [employment] action." *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir.1996) (citation and quotation marks omitted).  Given that less than three months' time expired between Allen's complaints about Rahmani and her discharge, a reasonable factfinder might infer that her discharge was based upon her sex.  The burden now shifts to ADIC to proffer a legitimate, nondiscriminatory reason for its adverse employment action.

>           b.   ADIC Terminated Allen's Employment for Legitimate Non-
>                Discriminatory Reasons

The record reveals that Stonecipher decided to include Allen in the reduction-in-force based upon his judgment that she lacked the technical expertise to lead the Ithaca facility and had not demonstrated the ability to coordinate the various elements of the Ithaca facility, *see* Dkt. No. 18, Stonecipher Aff. at ¶ 9, which had transformed into a product development and engineering organization and required leadership with engineering credentials and experience. *See id.*, Ex. 29.

ADIC points to the fact that Allen does not possess an engineering degree.  *See id.*, Allen Tr. at 160.
The burden now shifts back to Allen whom the Court must afford "an opportunity to prove by a
preponderance of the evidence that the legitimate reasons offered by the defendant were not its true
reasons, but were a pretext for discrimination."

> c.    Lack of Pretext

The record confirms that ADIC included Allen on the original layoff list of forty names it
assembled on or about September 25, 2001.  Dkt. No. 18, Van Oppen Dep. at 124-25; Stonecipher
Aff. at ¶¶ 8-9; Rahmani Dep. at 183-84.  Stonecipher made the decision to include Allen on the layoff
list because of her lack of technical skills.  Nevertheless, from late September 2001, through late
October 2001, ADIC asserts that it was considering two options that would keep Allen as an
employee: (1) transferring her to another position within the company; or (2) granting her an
extended leave of absence to allow her to complete her education.  Dkt. No. 21, Reply Mem. of Law
at 5; Dkt. No. 18, Pl.'s Ex. 21.  There is no dispute that Van Oppen discussed these options with
Allen.  *See* Dkt. No. 21, Reply Mem. of Law at 6; Dkt. No. 20, Counter Statement of Material Facts
at ¶ 95.  Van Oppen was to meet with Allen to discuss a leave of absence agreement on October 16,
2001, a day *after* Allen's termination was to have already occurred, which reasonably suggests that
Allen was still in fact employed as of October 16, 2001.  ADIC, however, did not notify Allen of her
termination until October 30, 2001, a mere five days after Allen's attorney sent ADIC a letter
reiterating Allen's intention to pursue claims of gender discrimination.  The fact that Allen's
termination occurred on the heels of her expressing her intent to litigate her claims of sex
discrimination raise a question of fact as to ADIC's motivation in terminating her.  Summary
judgment is not appropriate for Allen's sex discrimination claim.

3.      Retaliation Under Title VII/NYHRL

Retaliation claims asserted under Title VII are also governed by the burden-shifting analysis set forth in *McDonnell Douglas Corp.*, 411 U.S. at 802-04; *Raniola v. Bratton*, 243 F.3d 610, 624 (2d Cir. 2001).  To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show: (1) participation in a protected activity known to the defendant; (2) the employer was aware of the plaintiff's participation in the protected activity; (3) an employment action disadvantaging plaintiff; and (4) a causal connection between the protected activity and the adverse employment action.  *See Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001).  The term "protected activity" refers to action taken to protest or oppose statutorily prohibited discrimination.  *Cruz*, 202 F.3d at 566 (citing 42 U.S.C. § 2000e-3).  Opposition to a Title VII violation need not rise to the level of a formal complaint in order to receive statutory protection; " 'opposition' includes activities such as 'making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges.' "  *Id.* (citing *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)).  Moreover, "[i]t is not required that the conduct opposed actually constitute a violation of Title VII.  *See Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999) ("[A] plaintiff need not establish that the conduct he opposed was actually a violation of the statute so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated that law." (internal quotation and alteration omitted)).  The causal connection needed for proof of a retaliation claim " 'can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.' "  *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir.1996) (quoting *Manoharan v. Columbia University College of*

*Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988)).

Here, it is clear that Allen brought complaints of an alleged hostile work environment to the attention of ADIC's management personnel, and she informed Van Oppen that planned to take legal action against ADIC.  For a plaintiff's conduct to constitute participation in a protected activity, it is enough that she has made "informal protests of discrimination, including making complaints to management . . . so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Gregory v. Daly*, 243 F.3d 687, 700-01 (2d Cir. 2001) (internal quotations and citations omitted).  Although the Court has dismissed Allen's complaint of a hostile work environment, the conduct of which Allen complained need not rise to the level of an actual violation of Title VII.  Moreover, Allen also informed ADIC that she planned to sue ADIC for sex discrimination prior to ADIC notifying her of her termination.  Construing the evidence in Allen's favor as it must on a motion for summary judgment, the Court assumes that Allen's complaints about a hostile work environment and disparate treatment, constituted protected activity under Title VII.  Furthermore, Allen has raised a question of fact with respect to the causal connection between her protected activity and ADIC's termination of her employment because less than three months' time expired between her complaints about Rahmani and her discharge.  *See Reed*, 95 F.3d at 1178 (citation and quotation marks omitted) (explaining that causal connection to support retaliation claim "can be established indirectly by showing that the protected activity was closely followed in time by the adverse [employment] action."); *Gorman-Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 555 (2d Cir. 2001) (finding temporal proximity of four months sufficient to support a causal connection); *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980) (eight-month gap between EEOC complaint and retaliatory action suggested a causal

22

relationship).  Summary judgment is not appropriate for Allen's retaliation claim.

**III.     CONCLUSION**

WHEREFORE, after careful consideration of the parties' submissions and the applicable law, it is hereby

ORDERED, that defendants' motion for summary judgment (Dkt. No. 18) pursuant to Rule 56 of the Federal Rules of Civil Procedure is GRANTED IN PART and DENIED IN PART such that defendant's motion for summary judgment dismissing plaintiff's hostile work environment and EPA claims is GRANTED, and defendant's motion for summary judgment dismissing plaintiff's sex discrimination and retaliation claims is DENIED.

IT IS SO ORDERED.

Dated: March  30, 2007
Syracuse, New York

_____
Norman A. Mordue
Chief United States District Court Judge